**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **JIMMY LEE HARJO, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 14-cv-201-CVE-TLW** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Jimmy Lee Harjo seeks judicial review of the Commissioner of the Social Security Administration's decision finding that he is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **REVERSED AND REMANDED IN PART and AFFIRMED IN PART**.

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395

F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a 44-year old male, applied for Title XVI benefits on April 25, 2011, alleging a disability onset date of December 21, 2010. (R. 116-23). Plaintiff claimed that he was unable to work due to COPD, diabetes, and left eye blindness. (R. 133). Plaintiff's claim for benefits was denied initially on August 15, 2011, and on reconsideration on December 12, 2011. (R. 62-65). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and the ALJ held the hearing on November 27, 2012. (R. 29-61). The ALJ issued a decision on January 25, 2013, denying benefits and finding plaintiff not disabled. (R. 14-28). The Appeals Council denied review, and plaintiff appealed. (R. 1-4, Dkt. 2).

**The ALJ's Decision**

The ALJ found that plaintiff had not performed any substantial gainful activity since April 25, 2011, his application date. (R. 19). The ALJ found that plaintiff had severe impairments of "loss of left eye vision, chronic obstructive pulmonary disease (COPD), coronary artery disease status post stent placement, diabetes mellitus, obesity, and early degenerative joint disease." Id. Plaintiff's complaints of "elevated liver enzymes" and depression were nonsevere impairments. Id. The ALJ found that the record demonstrated that plaintiff had normal liver enzymes, posing no restrictions or limitations on plaintiff's functioning. Id. The ALJ also evaluated plaintiff's depression using the "paragraph B" criteria and found that plaintiff had no limitations in activities of daily living, mild limitations in social functioning, and no limitations in concentration, persistence, or pace. Id. Therefore, plaintiff's depression also imposed "no

significant limitations or restrictions." Id. Plaintiff's impairments did not meet or medically equal a listing. Id.

The ALJ then reviewed plaintiff's testimony and the administrative record. (R. 20-22). Plaintiff testified to multiple complaints regarding his vision. (R. 20). Plaintiff lost vision in his left eye as a child. Id. He complained that he now needs bifocals and that his diabetes mellitus impacts his right eye, causing blurry vision and issues with depth perception. Id. Plaintiff admitted, however, that he is able to watch television without issue while wearing his glasses. Id.

Plaintiff complained of anger and irritability when his blood sugar levels are elevated. Id. He testified that "his liver is sore" due to elevated enzyme levels. (R. 20-21). Plaintiff admitted to a history of excessive drinking, and he continues to drink at a reduced level "on a monthly basis." (R. 21).

Plaintiff testified to pain in his hands based on a history of broken bones that were never properly set. Id. Plaintiff chose not to have his hands put in a cast because he could not work without the use of his hands. Id. The ALJ found that no evidence in the medical records of injury to the hands or complaints of hand pain. Id.

Plaintiff further testified that he smokes a pack of cigarettes daily, despite the fact that he has COPD. Id. Plaintiff testified that his cigarettes cost $90 per month. Id. The ALJ noted that plaintiff found money for cigarettes but testified that he could not afford a $10 co-pay for counseling. Id.

The medical records indicate that plaintiff received treatment for "'a plethora' of problems" at Muskogee Nation Health Services. Id. There, plaintiff reported a history of coronary artery disease and stent placement in January 2012, COPD, orthopnea, dyspnea, a history of alcohol abuse and report of abnormal liver enzymes, and knee pain from playing

football in junior high school. Id. Despite his complaints, a physical examination revealed that plaintiff had normal range of motion, normal strength, and no pain. Id. X-rays from May 2012 revealed patellar enthesopathy, which was consistent with early mild degenerative joint disease. Id. However, treatment notes indicate that plaintiff has no "crepitus, decreased mobility, joint locking, joint tenderness, limping, instability, popping, spasms, and weakness" in his knees. Id.

Plaintiff is prescribed medication and insulin to treat his diabetes mellitus. Id. The ALJ found, however, that plaintiff is not "fully compliant with his prescribed dosages" and continues to drink alcohol. Id. The ALJ cited plaintiff's own report to his doctor in September 2012, in which plaintiff indicated that he was skipping a dose of Metformin in the evenings and was only taking Glipizide ER 5 once daily instead of twice. (R. 22). At the same appointment, plaintiff complained of elevated blood sugar levels and increase urinary frequency. Id. At the hearing, plaintiff reported that elevated blood sugar levels also caused blurred vision in his right eye. Id.

The ALJ considered plaintiff loss of vision in his left eye but noted that plaintiff lost his left eye vision as a child and was able to work "for many years with just vision in his right eye." Id. The ALJ also found that plaintiff's complaints of blurry vision in his right eye are related to his noncompliance with his diabetes medication. Id. Additionally, plaintiff has glasses to correct his vision, but he chose not to wear them at the hearing. Id. He does wear them when he watches television. Id.

The ALJ also weighed the opinion evidence and gave great weight to the agency physicians' opinions regarding plaintiff's mental and physical limitations. Id. The agency physicians concluded that plaintiff can "perform a narrow range of medium exertional tasks" and has no severe mental impairments. Id. The ALJ also gave great weight to the opinion of treating physician, Dr. Phillip Washburn, who stated that plaintiff's normal chest x-rays and continued

exposure to cigarette smoke (both first- and second-hand) would make it "difficult to get SSI." Id. Dr. Washburn found some limitations due to plaintiff's knees but stated that "[f]rom a physical point of view, he appears to be in pretty fair health." Id. The ALJ found that Dr. Washburn's opinion was consistent with the record. Id.

The ALJ acknowledged that plaintiff has issues with shortness of breath due to COPD, mild degenerative joint disease in his knees, and diabetes mellitus. Id. However, the ALJ also found that overall, plaintiff's own physician found him to be "in pretty fair health," despite the fact that plaintiff continues to smoke, refuses to comply with his diabetic medication regimen, and continues to drink alcohol. Id. Based on the record, the ALJ concluded that plaintiff retains the residual functional capacity to perform light work with the following limitations: (1) plaintiff "is able to perform tasks where there is only an occasional requirement for exposure to extremes of heat, wet or humidity, and where there is only an occasional requirement for exposure to respiratory irritants;" (2) plaintiff "is able to perform tasks where there is no requirement for fine or acute binocular vision, and where there is no requirement for good depth perception;" and (3) plaintiff "is able to perform tasks where he may avoid exposure to normal work-place hazards such as unprotected heights, open flame, or fast and dangerous machinery." (R. 20).

With this residual functional capacity, the ALJ found that plaintiff was unable to perform his past relevant work, which ranged from medium to heavy exertion. (R. 22-23). However, relying on the testimony of the vocational expert, the ALJ found that plaintiff was able to perform other work, such as mailroom clerk, retail attendant, or retail clerk. (R. 24). Accordingly, the ALJ found that plaintiff was not disabled. Id.

**The ALJ Hearing**

The ALJ held a hearing on November 27, 2012. (R. 29-61). Plaintiff reviewed his work history. (R. 34-37). He last worked for a civil contractor as a finisher. (R. 37-38). He was fired from that job because "[m]e and my foreman had a misunderstanding, and my anger got the best of me." (R. 38). He had not returned to work because "I have problems breathing." Id.

In addition to his breathing issues, plaintiff testified that he has problems with blindness, diabetes, anger issues, and his left knee. (R. 39). He could bend down, but he could not get up. Id. With respect to his vision, plaintiff testified that he became blind in his left eye as a child. Id. His vision in his right eye had recently changed, requiring him to wear bifocals in order to read. (R. 40). He also complained that uncontrolled diabetes was affecting his vision, causing blurry vision and trouble with depth perception. (R. 40-41). Plaintiff stated that he had cut his hand and injured his leg as a result of his diminished vision. (R. 51).

Plaintiff also testified that high blood sugar levels made him irritable and caused an elevation in his liver enzymes. (R. 43-44). As a result, his liver felt "sore." (R. 44). Plaintiff admitted that he once abused alcohol, but since his diabetes diagnosis, he no longer drank daily. (R. 44-45). He estimated that he consumes alcohol "once a month." (R. 45).

Plaintiff also stated that he has a limited ability to walk, due to his breathing. (R. 45-46). He can walk a block and a half before needing to stop and catch his breath. (R. 46). Chores such as taking out the garbage result in heavy breathing. Id. He sometimes loses his breath just sitting. Id. Sitting also causes pain in his buttocks. Id. Standing causes pain in his kidneys, as though somebody is "twisting" them. (R. 50).

Plaintiff sleeps about seven hours a night, although he gets up frequently to urinate due to his uncontrolled diabetes. (R. 48-49). In a typical day, he helps do small household chores. (R.

49). Plaintiff testified that he can walk around the yard picking up trash or use the riding lawn mower to cut the grass. Id. He can do dishes, but he has to take breaks due to pain in his kidneys while standing. (R. 50).

Plaintiff also testified that he has trouble gripping things due to old injuries to his hands. Id. Plaintiff testified that he had broken bones in his hands but did not have them set because a cast would have prevented him from working. Id. He speculated that he might have arthritis as a result. Id.

Plaintiff stated that he was no longer seeking treatment for his anger issues because he cannot afford to pay the $10 copay. (R. 52). He testified that his doctors give him pamphlets and talk to him about available programs, but he is not currently receiving treatment. Id. The ALJ then asked him about his smoking habit. (R. 53). Plaintiff testified that he smokes a pack of cigarettes every day, at a cost of $3 per pack. Id. However, plaintiff denied that he spends $90 per month on cigarettes, stating that when he does not have money, he does not buy them. (R. 54).

The ALJ then took testimony from the vocational expert. (R. 55-61). The vocational expert identified plaintiff's past relevant work as medium to heavy exertion. (R. 56). The ALJ then posed a hypothetical involving an individual of plaintiff's age and education who could perform light work but would need to avoid more than occasional exposure to respiratory irritants and extreme heat and would not be able to perform jobs "that required good depth perception in order to avoid injury or hazards." (R. 56-57). The vocational expert testified that plaintiff could not perform his past relevant work with those limitations, but he could perform other work, such as a mailroom clerk, retail attendant, or rental clerk. (R. 57-58).

The ALJ posed a second hypothetical that added the additional limitation of "superficial and incidental work related interaction with coworkers and supervisors but no significant public interaction." (R. 58). The vocational expert testified that plaintiff could not work as a retail attendant or rental clerk, but she added other representative jobs that plaintiff could perform, such as a marker or assembler. Id.

The ALJ then posed a third hypothetical that added the limitation of occasional handling and fingering. Id. The vocational expert testified that with those limitations, all of the previously identified jobs would be eliminated, and the only available job for plaintiff would be a job as a surveillance monitor. (R. 59).

Plaintiff's counsel then asked the vocational expert whether an additional limitation of "limited near acuity" would impact plaintiff's ability to work in the first and second hypotheticals. (R. 59). The vocational expert testified that plaintiff would only be able to perform the job of marker, which requires near acuity and depth perception only on an occasional basis. (R. 59-60).

**Plaintiff's Medical Records**

Plaintiff's medical records from a previous application show that he complained of shortness of breath as early as May 2009. (R. 194-208). Plaintiff was also enrolled in a smoking cessation class in May 2009, but he failed to attend. (R. 206-07). In August 2009, plaintiff complained of blurry vision, even with glasses, a month after he was diagnosed with diabetes. (R. 210). He also complained of mood swings shortly after being diagnosed with diabetes. (R. 214).

In July 2010, plaintiff underwent a consultative physical examination with Dr. Brad Liston. (R. 259-64). Plaintiff reported that he had been diagnosed with COPD the previous year

but was still smoking a pack of cigarettes per day. (R. 259). He complained that he could not exert himself without experiencing shortness of breath but was able to perform all activities of daily living. Id. Plaintiff also reported blindness in his left eye "secondary to trauma as a child." Id. During the examination, plaintiff's right eye vision was 20/25, and his physical examination was normal. (R. 260-64). Dr. Liston's impression was COPD, type II diabetes, and left eye blindness. (R. 260).

An agency psychologist completed a Psychiatric Review Technique form in August 2010, opining that plaintiff did not have a severe mental impairment. (R. 265-78). The psychologist found that plaintiff's history of depression was brief, was related to his diabetes diagnosis, and caused no functional limitations in any of the "paragraph B" areas of functioning. (R. 275, 277).

In September 2010, an agency physician completed a physical residual functional capacity assessment form, finding that plaintiff could perform medium work. (R. 279-86). The physician opined that plaintiff had limited depth perception, due to blindness in his left eye and should avoid concentrated exposure to fumes, odors, dusts, and gases due to his COPD. (R. 282-83).

The newly added medical records indicate that plaintiff sought treatment for a laceration/puncture wound to his left hand caused by an accident with scissors in February 2011. (R. 288-94). The record indicates that this injury was an acute injury.

Plaintiff also sought treatment at Family and Children's Services for anger issues in March 2011. (R. 299). The intake form indicates that plaintiff was pessimistic about the efficacy of anger management treatment, stating that he had tried counseling and found that it did not work. Id. Plaintiff attended a follow-up session the following week and was a bit more optimistic

but did not believe that "he can control his thoughts" or "respectfully" confront others. (R. 301). In his third and final session, plaintiff expressed the belief that most of his anger was directed toward his wife, from whom he was separated. (R. 302). Plaintiff was directed to schedule an appointment for the following week, but the record indicates that plaintiff did not return for continued treatment. Id.

In April 2011, plaintiff reported that he was having no trouble with blood sugar levels, but he complained that he continued to have shortness of breath and needed to quit his job. (R. 307). The treating physician noted that plaintiff was still smoking. Id.

Plaintiff underwent a physical consultative examination in July 2011. (R. 327-33). Plaintiff complained of blindness in his left eye and shortness of breath, which limited his ability to walk to one or two blocks. (R. 327). Plaintiff also reported, however, that he could perform all household chores and activities of daily living. Id. Vision in his right eye was 20/30, and plaintiff's examination was normal. (R. 327-33). The consultative examining physician assessed plaintiff with hypertension, diabetes, COPD, and tobacco abuse. (R. 329).

An agency physician completed a physical residual functional capacity assessment form in August 2011. (R. 334-42). The agency physician opined that plaintiff could perform light work but had visual limitations in all categories, including near acuity, far acuity, and depth perception, and should avoid concentrated exposure to heat and fumes, odors, dusts, and gases. Id.

In October 2011, a second agency physician requested a pulmonary function study and chest x-rays. (R. 343). Following those tests, the agency physician found that although plaintiff's complaints of shortness of breath were partially credible, the previous physical residual functional capacity assessment for light work was affirmed. (R. 363).

An agency psychologist completed a Psychiatric Review Technique form in December 2011. (R. 364-77). The psychologist found that plaintiff's history of depression was a nonsevere impairment. Id. The psychologist noted that plaintiff's only treatment was in 2011 for "anger problems." (R. 376). Plaintiff was treated, however, by a non-acceptable medical source who never provided a diagnosis. Id. Plaintiff's only functional limitation was a mild limitation in social functioning, due to "the presence of anger and seeking out individual therapy." Id.

In January 2012, plaintiff underwent an angioplasty with stent placement, following emergency room treatment for chest pain. (R. 378-403). At the time of the angioplasty, plaintiff had "abnormal liver chemistries, possibly due to recent diabetes exacerbation and acute illness." (R. 381). In follow-up appointments at three weeks and six months, plaintiff's condition was stable. (R. 378-79).

Plaintiff first complained of knee pain in March 2012. (R. 463-66). Plaintiff received a knee injection and was ordered to take naproxen and perform knee exercises. (R. 466). Plaintiff underwent x-rays for knee pain in May 2012. (R. 412-13). Plaintiff had "patellar enthesopathy" in his left knee and "[e]arly degenerative changes of the patella" in his right knee. Id. No treatment plan is indicated in the record, other than an injection given that day, but two weeks after the x-rays, plaintiff returned to the doctor complaining of knee pain. (R. 451-55, 462). The physician agreed to an orthopedic referral. (R. 453).

At that time, plaintiff also complained of "intermittent 'dsypneic spells.'" (R. 456). His treating physician noted that plaintiff still smoked heavily and could not quit because his wife continued to smoke as well. Id. The treating physician also noted that plaintiff had applied for SSI and opined that "[w]ith normal chest x-rays I think it will be difficult to get SSI." Id. Although plaintiff's "knees for sure give some disability . . . [f]rom his history it is very difficult

to quantitate how much disability is present. From a physical point of view he appears to be in pretty fair health." Id. Other than symptoms of COPD, plaintiff's examination was normal. (R. 457-58).

At his diabetes appointment in September 2012, plaintiff complained of elevated blood sugar levels and increased urinary frequency. (R. 443). Plaintiff initially reported that he was compliant with his medication, but he later admitted that he was skipping his evening dose of Metformin and was taking Glipizide once a day rather than twice daily as prescribed. (R. 444). Plaintiff also reported that he had drunk alcohol within the past week. (R. 443).

In late September 2012, plaintiff sought emergency room treatment for uncontrolled blood sugar levels. (R. 404-10). Plaintiff reported that he had been diagnosed with diabetes for a number of years and that it was normally well-controlled. (R. 405). The emergency room physician increased plaintiff's medication and ordered him to follow up with his primary care physician. (R. 409). At a follow-up visit in early October 2012, plaintiff reported that he had been to the emergency room twice in the last two weeks for high blood sugar levels and that the increase in medication was not working. (R. 439). Plaintiff admitted that he missed his last monthly appointment and that he consumed alcohol two weeks ago. Id.

## ANALYSIS

On appeal, plaintiff raises three points of error: (1) that the ALJ erred at step five by failing to include all of plaintiff's impairments in the hypothetical to the vocational expert; (2) that the ALJ did not properly weigh the medical opinion evidence; and (3) that the ALJ did not perform a proper credibility analysis.

**Hypothetical**

Plaintiff argues that the ALJ did not include all of plaintiff's limitations in the hypothetical. (Dkt. 14). Specifically, plaintiff argues that the ALJ did not consider plaintiff's nonsevere depression or the additional visual limitations included in the agency physician's opinion. Id. Plaintiff contends that the vocational expert's testimony at the hearing demonstrates that the additional visual limitations, particularly near acuity, would eliminate all but one job identified by the vocational – that of "marker." Id. Plaintiff argues that even that job requires occasional use of near vision, which is not consistent with the ALJ's finding that plaintiff has a limitation on near vision. Id. Additionally, plaintiff argues that the marker position does not exist in significant numbers in the State of Oklahoma. Id.

First, the Commissioner responds that the ALJ addressed all of the limitations borne out by the record when posing a hypothetical to the vocational expert. (Dkt. 15). The Commissioner contends that the evidence of plaintiff's depression, knee pain, and visual acuity indicate that plaintiff has no functional limitations and that the record supports the ALJ's hypothetical. Id. With respect to the marker job, the Commissioner notes that the ALJ did not rely on this job in her decision; however, the Commissioner argues that the position would accommodate the additional vision limitations that plaintiff proposes and that the job exists in significant numbers in the national economy. Id.

An ALJ's hypothetical "must include all (and only) those impairments borne out by the evidentiary record." Evans v. Chater, 55 F.3d 530 (10th Cir. 1995) (citations omitted) (parenthetical in original). However, the hypothetical also must "relate with precision all of a claimant's impairments" in order for the vocational expert's testimony to qualify as substantial evidence supporting the ALJ's decision. Hargis v. Sullivan, 945 F.2d 1482, 1492 (10th Cir.

1991). In this case, the ALJ's hypothetical did not mirror her residual functional capacity findings. The only visual limitation included in the ALJ's hypothetical was a restriction on jobs that required plaintiff to have good depth perception. (R. 57). However, in her residual functional capacity findings, the ALJ also included a limitation on "fine or acute binocular vision." (R. 20).

This additional limitation on "fine or acute binocular vision" is problematic for two reasons. First, the undersigned cannot determine what the ALJ meant by the phrase "fine or acute binocular vision." The ALJ discussed the loss of vision in plaintiff's left eye, which occurred when plaintiff was a child. Id. The ALJ noted that she had taken this loss of vision into account, but she did not explain what limitations, if any, were associated with the blindness in plaintiff's left eye. Blindness in one eye, however, was not the only vision problem that plaintiff alleged. Plaintiff testified that he has blurry vision due to elevated blood sugar. (R. 20, 22, 40-42). The ALJ did not state whether she believed that plaintiff's blurry vision was related to uncontrolled diabetes. (R. 22). Instead, the ALJ found that plaintiff was not compliant with his diabetes medication. Id. She also found that plaintiff has glasses which he often chooses not to wear. Id. When plaintiff does wear his glasses, he is able to watch television with no vision problems. Id. Additionally, the ALJ gave great weight to the agency physician's residual functional capacity analysis, which found that plaintiff had visual limitations in near acuity, far acuity, depth perception, accommodation, color vision, and field of vision, due to "Left eye blindness." (R. 337). But the ALJ did not discuss the agency physician's opinion as it relates to plaintiff's vision, so it is not clear whether the ALJ interpreted these limitations to be related solely to plaintiff's loss of vision in the left eye or to plaintiff's alleged blurry vision as well.

Second, the Commissioner argues that any error in the ALJ's description of plaintiff's visual limitations is harmless because the testimony taken at the hearing demonstrates that the

additional visual limitations included in the opinions that the ALJ gave great weight do not prevent plaintiff from performing the job of marker, a position that meets the requirement of having a significant number of jobs available in the national economy. (Dkt. 15).

In the context of Social Security disability cases, the Tenth Circuit has established a harmless error analysis, by which the Court may excuse an ALJ's error and affirm the administrative decision. See Allen v. Barnhart, 357 F.3d. 1140 (10th Cir. 2004). That rule permits the Court:

> to supply a missing dispositive finding under the rubric of harmless error in the right exceptional circumstance, i.e., where, based on material the ALJ did at least consider (just not properly), [the Court] could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.

Allen, 357 F.3d at 1145 (declining to apply the rule when the ALJ's step five findings yielded only one job with low numbers statewide but acknowledging that the rule could apply). The Tenth Circuit has cautioned, however, that courts should apply harmless error "cautiously." Fischer–Ross v. Barnhart, 431 F.3d 729, 733–34 (10th Cir. 2005).

The marker position, on the surface, meets the requirements of the ALJ's first hypothetical, which limited plaintiff to light work, avoiding concentrated exposure to respiratory irritants and extreme heat, and avoiding jobs "that required *good* depth perception in order to avoid injury or hazards." (R. 57-58) (emphasis added). Nonetheless, the vocational expert testified, in response to questions from plaintiff's counsel, that the marker position would require occasional near acuity and depth perception. (R. 60). Therefore, it is not clear whether the marker job would accommodate plaintiff's visual limitations. (R. 59-60). In light of the ambiguity in the ALJ's stated residual functional capacity findings that plaintiff was unable to

perform jobs that require "fine or acute binocular vision," the undersigned does not believe that application of the harmless error rule is appropriate in this case.

For these reasons, the undersigned recommends that the District Court remand the case to require the ALJ to clarify the description of plaintiff's visual limitations and explain how those limitations impact plaintiff's ability to perform other work. If necessary, the ALJ may seek additional testimony from a vocational expert.

**Medical Opinion Evidence**

Plaintiff next argues that the ALJ failed to properly weigh the medical source opinions. Plaintiff contends that the ALJ did not explain why he gave great weight to the opinions of the treating physician and agency physicians. (Dkt. 14). Therefore, plaintiff argues that the basis for the weight given to those opinions is unclear and not supported by substantial evidence. Id. Plaintiff also contends that the ALJ did not adopt all of the visual limitations contained in those opinions, despite the fact that the ALJ gave them great weight. Id. Plaintiff further contends that the ALJ did not conduct a proper treating physician's analysis because the ALJ failed to determine whether the treating physician's opinion was entitled to controlling weight and failed to apply the factors for weighing the opinion. Id.

The Commissioner argues that plaintiff's attacks on the ALJ's evaluation of the medical opinion evidence amounts to a "form over substance" argument. (Dkt. 15). The Commissioner contends that, even if the ALJ had given controlling weight to the treating physician's opinion, the outcome of the case would not have changed because the medical opinions are consistent with the residual functional capacity findings. Id. Accordingly, the Commissioner argues that any error in applying the regulatory factors for medical source opinions is harmless error. Id.

In giving great weight to the opinions of the agency physicians and plaintiff's treating physician, Dr. Washburn, the ALJ states generally that the opinions are consistent with the record. (R. 22). While the ALJ could have given more specific reasons for her decision to give "great weight" to these opinions, "[w]hen the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened." Howard v. Barnhart, 379 F.3d 945, 947 (10th Cir. 2004). Here, the ALJ gave great weight to the opinions, so the need for more specific findings is not required. Likewise, the weakened need for express analysis also renders the ALJ's failure to apply the statutory factors in 20 C.F.R. § 416.927 harmless error. See id. See also Keyes-Zachary v. Astrue, 695 F.3d 1156, 1161 (10th Cir. 2012) (holding that the failure to address a medical opinion is harmless error when there are no "inconsistencies either amount these medical opinions or between the opinions and the ALJ's RFC"); Lauxman v. Astrue, 321 F.App'x 766, 769 (10th Cir. 2009) (unpublished)[1] (holding that the ALJ's failure to address the statutory factors in considering a consultative examining physician's opinion was harmless under the principles set forth in Keyes-Zachary and because the Court was able to follow the ALJ's reasoning).

However, plaintiff correctly notes that the agency physician's physical residual functional capacity assessment includes a number of visual limitations that, on their face, do not appear to be included in the ALJ's residual functional capacity. The agency physician found that plaintiff had limited near acuity, far acuity, depth perception, accommodation, color vision, and field of vision due to "Left eye blindness." (R. 337). It is not clear to the undersigned whether the ALJ interpreted this opinion to mean that these limitations applied only to plaintiff's left eye – meaning that plaintiff had these limitations due to blindness in the left eye – or whether

[1] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

plaintiff's remaining vision was impaired.[2] Because the ALJ's findings regarding the limitations in plaintiff's vision are ambiguous, her interpretation of the agency physician's opinion is also ambiguous, particularly with respect to the limitation on near acuity.

For these reasons, the undersigned recommends that the District Court remand the case for the ALJ to explain how the agency physician's opinion regarding plaintiff's visual limitations, which received great weight, is consistent with the ALJ's findings regarding plaintiff's visual limitations. The undersigned recommends a finding of no error on the remaining arguments regarding the consideration of the medical opinion evidence.

## **Credibility**

Plaintiff argues that the ALJ failed to perform a proper credibility analysis. (Dkt. 14). Specifically, plaintiff argues that the ALJ "did not discuss the Luna factors sufficiently, even omitting many of them altogether." Id. Plaintiff also argues that the ALJ improperly considered plaintiff's criminal and work history, compliance with treatment, and complaints of hand pain. Id.

The Commissioner argues that the ALJ gave five reasons for not finding plaintiff credible and that all five reasons are properly considered and supported by substantial evidence. (Dkt. 15). The Commissioner also argues that even if consideration of plaintiff's criminal history is questionable, the remaining reasons cited by the ALJ are sufficient to support the ALJ's conclusion that plaintiff is not credible. Id.

---

[2] Because the agency physician marked all of the limitations, including those that have no support in the record, such as color blindness, the undersigned interprets that opinion to mean that the restrictions only apply to plaintiff's left eye. However, in light of the ALJ's inclusion of only some of these limitations (near acuity and depth perception) in her residual functional capacity findings and the fact that the ALJ gave great weight to this opinion, the ALJ should have explained her interpretation of the agency physician's opinion.

This Court is not to disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990)). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995). "[A] formalistic factor-by-factor recitation of the evidence" is not required. Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000) (referencing Kepler).

In this case, the ALJ listed multiple reasons that plaintiff was not credible: (1) noncompliance with doctors' orders with respect to drinking, smoking, wearing glasses, and taking medication as prescribed; (2) complaints of hand pain and elevated liver enzymes that were not supported by the medical evidence; (3) poor work history; and (4) history of incarceration. (R. 20-22). The ALJ cited record evidence that plaintiff was not compliant with his doctors' orders, including evidence that plaintiff continued to smoke despite having COPD, continued to drink despite his diabetes and liver pain, refused to take his diabetes medication as prescribed, and refused to wear the glasses that corrected his blurry vision. The ALJ also found no evidence in the record that plaintiff had ever suffered a broken finger or complained of hand

pain, and the undersigned's review of the record also yielded no evidence of any such injury or complaint. (R. 21).

With respect to plaintiff's poor work history and criminal history, both are appropriate factors to consider in evaluating a claimant's credibility. See Watson v. Barnhart, 194 F.App'x 526, 530-31 (10th Cir. 2006) (unpublished) (citing SSR 96-7p and Bean v. Chater, 77 F.3d 1210, 1213 (10th Cir. 1995) regarding the proper consideration of poor work history); Duncan v. Colvin, 2015 WL 1475314, *9 (10th Cir. April 2, 2015) (affirming the ALJ's holding that a claimant's credibility was "eroded by a history of numerous violations of the law and subsequent incarcerations). Plaintiff does not challenge the ALJ's findings that he has a poor work history. Instead, he argues that the ALJ does not cite the evidence to support this finding. (Dkt. 14). The record, however, clearly indicates that plaintiff's earnings record is sporadic at best, with minimal earnings most years and several years of no earnings at all. (R. 126). Plaintiff also does not challenge the ALJ's findings regarding plaintiff's criminal history. Instead, plaintiff argues that only crimes of moral turpitude should be considered in assessing his credibility, citing a case from the Central District of California. (Dkt. 14). The undersigned, however, could not find any Tenth Circuit cases placing such a restriction on consideration of a claimant's criminal history in evaluating credibility in disability cases.

Even if the undersigned presumes that the ALJ erred in considering plaintiff's criminal history, that error does not undermine the ALJ's other credibility findings. See Pickup v. Colvin, 2015 WL 1515460, *2-3 (10th Cir. April 6, 2015) (affirming an ALJ's credibility findings despite errors in two aspects of the analysis because "the analysis was, on balance, proper and supported by substantial evidence"); Branum v. Barnhart, 385 F.3d 1268, 1274 (10th Cir. 2004) (holding that "the balance of the ALJ's credibility analysis is supported by substantial evidence

in the record."). On the whole, the ALJ gave sufficient reasons to support her finding that plaintiff was not credible, and those findings are supported by substantial evidence in the record. Accordingly, the undersigned finds no reason to reverse on this issue and recommends a finding of no error.

## RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the Commissioner's decision in this case be **REVERSED AND REMANDED IN PART** and **AFFIRMED IN PART**.

On remand, the ALJ should clarify the description of plaintiff's visual limitations and explain how those limitations impact plaintiff's ability to perform other work. If necessary, the ALJ may seek additional testimony from a vocational expert. The ALJ should also explain how the agency physician's opinion regarding plaintiff's visual limitations, which received great weight, is consistent with the ALJ's residual functional capacity finding regarding plaintiff's visual limitations, particularly the "near acuity" limitation. The undersigned recommends a finding of no error on the remaining arguments regarding the consideration of the medical opinion evidence and the ALJ's credibility findings.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by June 16, 2015.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has

properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. See also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 2nd day of June, 2015.

_____
T. Lane Wilson
United States Magistrate Judge